Next case call for oral argument is Wells v. Endicott. Whenever you're ready. May it please the court. My name is Michael and I represent the plaintiff in appellate in this matter, Matthew Wells, the Special Administrator in the state of Joseph Schoolfield. In my time before the court, I will demonstrate that it was error on the part of the Circuit Court of Madison County to dismiss the claims against defendants Kimberly and Dennis Endicott for three reasons. First, that the plaintiff has sufficiently pled facts saying forth a breach of voluntary custodian-protectee relationship. Secondly, that he has pleaded sufficient facts to spell out a claim for a breach of a voluntary undertaking. And lastly, that he has pled sufficient ultimate facts throughout this complaint with respect to those defendants. With regards to defendant McEwen, I will spell out that it was error from the Circuit Court of Madison County to have dismissed that case, the claims against Mr. McEwen, sui sponte for three reasons. Mainly, number one, that Mr. McEwen was sued as an individual, so he was a person amendable to being sued under 42 United States Code, section 1983. Secondly, that sufficient facts were pled to show that he had a personal involvement in the deprivation of Joseph Schoolfield's constitutional rights. And lastly, that physical custody or control or restraint on the part of the state is not the only state action that's considered relevant to determine whether or not someone's constitutional rights, substantive due process rights, have been violated. I'll briefly start with a recitation of the facts that have given rise to this underlying case. This case arises out of the death of a three-year-old child, Joseph Schoolfield. In September of 2008, Joseph was residing with his mother, Valerie Schoolfield, and her boyfriend, Scott Endicott, in a residence in Madison, Illinois, that was owned by Dennis and Kimberly Endicott. Throughout the month of September, Scott Endicott began beating Joseph Schoolfield at this residence in Madison. On September 25, 2008, an investigator from the Department of Children and Family Services interviewed Joseph at his daycare center. And after observing injuries, the investigator from the Department of Children and Family Services took Joseph into the agency's custody. It's been alleged in our complaints that this action was taken at the direction of Erwin McEwen, who at the time was the director of the Department of Children and Family Services. At a court hearing before the Circuit Court of Madison County on October 7, 2008, Joseph was temporarily returned to the custody of his mother, Valerie Schoolfield. The court, however, ordered that the Department of Children and Family Services was to investigate Joseph's need for services and to render them if such were needed. The court further ordered that there was to be a no-contact order placed for Joseph's protection against Scott Endicott if he was to vacate the Madison residence. Needless to say, none of that really happened. Scott continued to reside at the Madison residence with Joseph and his mother. They continued to batter or beat Joseph at the Madison residence all throughout the month of November of 2008. On November 25, 2008, an investigator and an intact family worker from the Department of Children and Family Services removed Joseph from his mother's custody once again. The investigator and the intact family worker again are alleged to have been acting at the direction of Erwin McEwen and they instituted a safety plan in which they would place the child in the temporary custody of Kimberly and Dennis Endicott, even though it was made known to all parties that Kimberly and Dennis Endicott were planning on having their son Scott over to their home for a holiday meal, and that there was this no-contact order entered in place for Joseph's protection against Scott Endicott. Let me ask a couple of questions about that safety plan because that's a written document, but it's virtually impossible to read. There is a part of it that says what time frames are imposed by this plan. Can you tell us what the time frames were in that safety plan? I don't have it in front of me, Your Honor. I just know that it was entered and I know that the safety plan was not terminated until a hearing at the circuit court on December 2nd, I believe it was. Okay, so was the safety plan terminated then on December 2nd? It was, and I'm moving to that, Your Honor. Okay, so it was not in effect on January 21st? It was not. The safety plan was terminated and Joseph was again returned to the temporary custody of his mother. Again, the status quo was supposed to be maintained. At this time, both Joseph, his mother, and Scott were all living at the home of Dennis and Kimberly Endicott Carlisle. Again, Joseph was continually beaten by Scott Endicott. All of this is alleged to have been done by all parties involved. Nothing was done. On January 21st, 2009, Scott Endicott beat Joseph so severely that he suffered multiple head injuries and he ultimately died three days later. The plaintiff then instituted this action, which is followed. With respect to the claims against Kimberly and Dennis Endicott, the plaintiff argues that he has sufficiently set forth a claim for breach of voluntary custodian and protectee relationship against Kimberly and Dennis Endicott. Now, as our Supreme Court has stated in Roe versus the State Bank of Lombard, the general rule is that a person is not liable for harm resulting from another person's failure to defend the other against a third party's criminal act. But we recognize that there are exceptions to this general rule, and one of them is when the plaintiff has a special relationship with the defendant when the attack by the third party occurs. The special relationship exists where a defendant voluntarily takes custody of another so as to deprive that person of his normal opportunities for protection. In Illinois, all that's required to create a voluntary custodian-protectee relationship is to show that the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare. This was expressly spelled out by the Second District Appellate Court in the case of Plattsville versus NSM American, Inc. In that case, the plaintiff was a high school girl who was working in a work-study program at the defendant's premise when she was assaulted on the premise by one of the defendant's employees. In her complaint, she alleged that she was supposed to be afforded protection under this custodian-protectee relationship, and this duty extended so far to say that she should have been protected from the employee. The employer had a duty to protect from the employee's acts, including certain acts that were outside of the employee's employment, outside the scope of his employment. The trial court originally granted a motion to dismiss on this matter, but the Second District reversed. They held that there was a viable cause of action that was made out. They noted that while a defendant typically has no duty to protect the plaintiff from the third party's criminal act, when the defendant voluntarily takes custody of another so as to deprive them of their normal opportunities for protection, that this would be an exception to that rule. The court noted that what it means to take custody of another and deprive them of their normal opportunities for protection was not necessarily made explicitly clear by Section 314A of the Restatement of Second Interest. But they found some guidance from the Minnesota Supreme Court's decision of Donaldson versus the Young Women's Christian Association from Duluth, which spelled out that if the plaintiff is in some respects particularly vulnerable and dependent on the defendant who holds considerable power over the plaintiff's welfare, then a voluntary custodian-protectee relationship exists. And in this case, they found that the facts of this case would fit this relationship. They felt as a work-study employer, they held power over this girl's welfare because they could affect her academic standing, and they felt that she was vulnerable because she was a student because of her age. Given this, they felt that the Second District felt that all the elements to state this claim under Section 314A would be met. In this case, I will submit to this court that that's exactly what we have here. We have Joseph Schoolfield, who was three years old. He's obviously dependent upon people for some place to live. The Indicots were allowing him to live in their homes. They had considerable power over his welfare. And the fact that I think he lives with him strengthens this argument to say that there was this relationship that existed, because if we're just going to say, as the Second District did in Plattson, that if we're going to find the work-study employers enough, certainly if you live with them, that ought to be enough. Now, the defendants in their briefs to this court have argued that the plaintiff has failed to state a cause of action for voluntary custodian-protectee relationship because, in their argument, the parental rights of the natural parents had to have been terminated in order for this relationship to exist. And they cite to a Minnesota Appellate Court case called Sonnenberg v. Howard for this proposition. That has never been held in Illinois. All we ask in Illinois is that the plaintiff must be, in some respect, particularly vulnerable and dependent upon the defendant who holds power over his welfare. There's no requirement that he has to have the parental rights of the natural parents must be terminated. That's never been held in any Illinois court case. And in light of these facts, I would submit to you that a sufficient claim has been made for voluntary custodian-protectee relationship. It's accurate, isn't it, that throughout all this time period, the mother was in the picture and had physical custody of the child, although perhaps living with the endocots? Your Honor, it's correct. With regard to the claims for breach of voluntary undertaking, all parties agree that these claims are actionable under Illinois law. And the theory of liability is predicated under Section 324 of the Restatement Defective Torts. One can undertake this duty gratuitously, though, as the Supreme Court found in the case of Wopulich v. Moran. In this case, I don't think there's any doubt that, again, there would have been a voluntary undertaking taken to protect this young child. If we look at the elements that the Supreme Court laid out in Wopulich to determine the elements of this cause of action, we'd find that the plaintiff is helpless to adequately protect himself. The defendant, while being under no obligation to do so, took charge of the plaintiff, that by taking charge of the plaintiff, the defendant voluntarily undertook a duty to the actor to exercise reasonable care and security for the safety of the plaintiff while he was in the defendant's charge, and the defendant failed to exercise care in performing this duty. All of these elements have been alleged in the plaintiff's complaint against Kimberly and Dennis Endicott. Now... Is your voluntary undertaking theory, cause of action, in any way based on the safety plan? Partly. Partly. Because, as you know, he would have been living with them, and they would have had at least temporary custody over him at that time. We also have just alleged the fact that he was being allowed to live with them, that that enough should be enough to say that they at least undertook a duty to protect this child. He's three years old. Well, in the safety plan, they certainly undertook, in writing, to supervise the child, protect the child, supervise any contact. I think I can read that much of it. Supervise any contact with their son and so forth. But, of course, a voluntary undertaking, cause of action, is only good to the extent of the undertaking, which is why I was asking about when it's terminated. So at the time of the child's death, that would have been over. So... I would disagree with Your Honor on one point there. If we look at the underlying facts of Wapulik v. Mraz, what we had in that case was a minor child who had been drinking at the defendant's home who ultimately ended up vomiting and choking on her own vomit while they just let her lay face down in their living room. In that case, the Supreme Court had found that there was a voluntary undertaking to afford some type of care for this minor child in that instance. Here, I think there's something way more than that, because we have a person who is physically living with these people, and he obviously is not able to help himself or protect himself. He's an infant child. And I think if the Supreme Court is going to be satisfied with that in Wapulik v. Mraz, then I think we have most definitely laid out a claim for breach of voluntary undertaking in this instance, because the fact that he's living with them, I think, indicates that they have undertaken the duty to protect him, especially when it's known by these two defendants that there's this no-contact order in place, and he's continually violating it on will by them allowing Scott to live with them and the child. Which then leads me to the last point with regard to the end accounts, which is that sufficient ultimate facts have been pledged in this case. It's been a constant refrain by the defendants that the plaintiff has just pled the conclusions of the pleader or that the complaint is totally devoid of ultimate facts. And the appellate courts have stated that there's no real clear distinction what is an ultimate fact, what's an evidentiary fact, what's the conclusion of the pleader. But at least we have found some guidance from, I know, the third district in Sofka v. Smith, the first district in the People X. Rel. Hardigan v. All-American Aluminum and Construction Company, have stated when a question arises as to whether something constitutes ultimate facts, evidentiary facts, conclusions of the law, Illinois courts simply determine whether the complaint in the particular case reasonably informs the opposing party of the nature of the claims against them. And that seems to be comporting with what is in our Code of Civil Procedure, section 5-2-612B, no complaint is bad in substance, which reasonably informs the opposite party of the nature of the claim against them that she's called upon to meet. This is all, the plaintiff has absolutely done that in this case. And if we're going to look at a 2-6-15 motion, which is what was granted with respect to the Endicotts, if we're looking at all of the facts that are most favorable to the plaintiff, then you have to say that if the plaintiff approved these facts, there could be liability against the defendants. Was there any further request to amend when this complaint was dismissed? It was an amended complaint, right? It was an amended complaint. And, I mean, was there any request, or did you, are we here because you stood on your pleadings as they were, or did the trial court say, you know, there's no set of facts you can plead under these circumstances, which would be a viable cause of action? It's not made clear by the court's order. All I know is that the court at that time just said that our facts, I guess, were not sufficient to support a cause of action, and they granted the 2-6-15 motion to dismiss with prejudice. Okay. I mean, it was with prejudice, but there was no request to further amend, I guess. I did not make any further request to amend because the motion was granted and dismissed with prejudice. Moving to Defendant Irwin McEwen, the first point that I would make with respect to Mr. McEwen is that he is a person who is amendable to being sued under Section 1983. The Supreme Court of the United States, in the case of Will v. The Michigan Department of State Police, stated that neither a state nor a person is acting in their official capacities are persons amendable to suit under Section 1983. But the Seventh Circuit Court of Appeals, in the case of Hill v. Shelander, set forth some other guidelines for lower courts to follow to say just when exactly is someone sued as an individual and when exactly are they sued as a state official. To establish a personal liability suit, the court said that it's enough to show that the official acting under color of state law caused the deprivation of a federal right. And they say that further, we're only going to assume an official capacity suit if there is some allegation that says that the defendant's conduct was somehow linked with some type of official policy or custom. And lastly, the court in Hill stated that we just got to look at everything overall to determine in what capacity will someone sue. Here, the plaintiff has expressly stated that he has sued Mr. McKeown as an individual. There is absolutely no indication in our complaint saying that he violated some type of official custom or policy, so we should not assume an official capacity suit. Okay, well, let me ask a question then. I mean, is there any allegation against Mr. McKeown that he took personal direct action involving this suit? That leads to my next point, Your Honor. I mean, because, I mean, he's the director. Correct. And aren't you, in effect, in your complaint saying because he's the director, the local official was following his policies? That is exactly correct, which is something that gets us past, which if you allege that he is, that a state actor is acting at the direction of someone, that satisfies the personal involvement requirement. Here, if you look at the state statutes that set forth the agency, the duties of the director, it's reasonable to assume that these people, when they act, these subordinates, they're acting at the behest of the director. I would ask the court to draw their attention to. So basically your argument would be that any time you have a viable cause of action against a Department of Children and Family Services worker, you also have one against the director of the Department of Children and Family Services? Obviously it would be my burden to prove that, but from where we are. What would you have to prove differently then in different cases? I'm not sure. I mean, if what you're saying is the local official was acting in accordance with the policies established by the director, I mean, wouldn't that be true then in every case? It's a little bit more complicated than that. Well, I think what my burden to prove here is, is not just that they're acting in accordance with the policies laid out by the director, but that they're acting at the behest of the director, that the director isn't actually dictating what actions to be taken. And that is what's indicated in the statute. But there's nothing alleged, is there, that the director had any personal involvement about Joseph Schoolfield? It is alleged in the complaints here. In the First Amendment complaint, it is alleged that these actions were taken at the direction of Mr. McKim. And I hate to ask you if you actually have any evidence that there was a conversation between the director and somebody about Joseph Schoolfield. Well, again, that would be something we'd have to take up in the discovery phase, which the Circuit Court of Madison County never allowed me to get to. They stopped me on my pleading. Again, I would say it is our burden to prove that, but that has been alleged. When you say acting at the behest, are you saying, just to follow up on Justice Stewart's question, are you saying that at the behest because the policy was explicated and this person was following it, or are you saying that the director had actual knowledge or could be imputed from supervision to have knowledge of this particular case? What exactly are you saying as to the state's knowledge of the director? From what the cases indicate, you have to show some type of direct involvement in order for a 1983 claim to go forward. And what is direct involvement in this case? That he would have dictated the actions that had to have been taken. He personally dictated those actions. Based on his knowledge of the case or based on his knowledge and formulation of policy? I would say it would have to, at least from what the cases indicate, it would have to be based on his knowledge of the case, which, again, is my burden to prove. But you didn't allege any specific knowledge that he had, and you're saying we just have to get that in discovery. Well, I don't think that there's never been any ruling around it that says I have to set forth all of my evidence in my complaint. Well, you have to have a good faith basis upon which to make an allegation in the complaint. I think that we have that here, Your Honor. Of the director's personal involvement in this case? Yes. I think we have a good faith argument to make that when someone is acting, they're doing so at his direction. He is ultimately the person who is in charge of the agency. Someone must have to tell these folks what actions they should take. And that would be the personal involvement? Yes. Okay. All right. Thank you, counsel. I'm not sure which, whoever's arguing first. Thank you, Your Honor. Michael Scodro from the Office of the Illinois Attorney General. I'm here on behalf of the defendant affilee, Director McEwen. I will do this as quickly as possible and remit all remaining time to co-affilees here on behalf of the endicots. Let me begin by saying, Your Honor, there are two independent grounds on which to affirm the judgment in favor of Director McEwen in this case. And the first one is the one that the court has been just asking questions about, namely the personal involvement. The U.S. Supreme Court, as recently as 2009 in its Iqbal decision, reaffirmed what has been established federal law, and that is there must be personal involvement by any official to be liable under Section 1983. And they distinguished that personal involvement from vicarious liability, which is essentially what's being argued here. In that case, parenthetically, even though the federal government has a more, the federal courts have a more liberal notice pleading standard, there the complaint was dismissed at the pleading stage, notwithstanding the fact that the complaint includes phrases like under the direction of the Attorney General and the Chief and the Director of the FBI, and that the Director knew certain things were true, very same allegations that are being made here. Illinois law makes clear that even in its, as far as what the complaint is required to do, there must be specific facts as to every element of the claim, and that the court is not supposed to check common sense at the door. As we say in our brief, in the LICA decision, courts are not to make unreasonable or unwarranted conclusions or draw unreasonable inferences. That's precisely what's being asked here. As the complaint makes, I'm sorry, as our brief makes clear, there are over 100,000, in a neighborhood of 100,000 complaints a year to the Department. There are thousands of employees at the Department. The claim here has to be that of those 100,000, this is the one that the Director himself personally, instead of the tears and tears of review between him and the line workers, this is the one where the Director personally got involved. We now know, not only the complaint that tells us that there's nothing more than this vicarious liability claim, we now know from judicial admissions, here in the reply brief, in the transcript of the June 29 hearing, at page 16, the circuit court asked him, just as the court did today, what's the basis for this personal involvement in this individual case? And the response was, well, someone had to tell these people what to do, and that person is McEwen because he's head of the Department. Again, based solely on the fact that he's the Director, it's a vicarious liability theory that's being alleged here. Indeed, if it's taken as true, what it would mean for the first time is that at any state, at any complaint, if a line individual in any state agency is named, the Director can also be named and have to go through a phase of discovery before being out of the case. The Governor, by the same logic, would be properly named, who sits on top of the state agencies. The same would hold for federal claims. A federal employee in the trenches, you'd be able to name the President of the United States because by this theory, the President is vicariously liable for those activities. This is precisely what the federal courts have done away with. Even if, switching gears, even if the court were to conclude that somehow he has pled specific facts as to why Director McEwen was involved in this specific case out of all of the hundreds of thousands of cases, this is the one, even if he had done so, the claims that are alleged here do not make out a substantive due process claim. And that's the reason, that's the alternative ground on which this court can affirm. The U.S. Supreme Court in DeShaney, the decision in that case was on all fours with this case here. The court announced there the general rule that there is no affirmative duty to protect a child from abuse by third parties. And that's what we have in this case. Rather, what DeShaney holds is that as a general proposition, the child has to be in the custody of the state at the time. Now, there are two narrow exceptions that I'll address briefly. But the general rule has to be in the child's custody or the state's custody at the time. Well, why wasn't that true here? Well, let's remember where the windows of state custody are here. There's really only one. It's from September 25th to October 7th when the court, not PCFS, but when a court returned custody to the mother of the child. During that period, it is alleged that the department had custody of the child. But there's no allegation that there was abuse permitted during that period in which the child was in the department's custody. The only other allegation of potential custody by the state is the safety plan. Now, we would vigorously contest the notion that a safety plan, which is voluntary, and as difficult as this is to read, one of the tight terms which is discernible in the exhibit is that this is a voluntary agreement. And by signing, you acknowledge that it's voluntary. This voluntary agreement did not create state custody. But even if it did, there's no allegation that during the short window of the safety plan, which ran from November 25th to December 2nd, that during that period there was any abuse of the child either. So DeShaney is clear. Because there was no abuse during those periods, there simply isn't a 14th Amendment substantive due process claim here. In my remaining time, I'll touch upon the two exceptions, because I think there's an effort to argue that this case somehow fits into one of those two exceptions in Counts 15 and 16 of the complaint, which are the two against direction. Count 15 talks about a special relationship, that there is somehow a special relationship between the DCFS and the child because from October, from rather September 25th to October 7th, they had custody, that that gave rise to an ongoing special relationship. That is precisely the claim rejected in DeShaney. Indeed, the plaintiffs to DeShaney used the word special relationship. And DeShaney on page 201 of that decision makes very clear that the mere fact that the child had been in custody of the state and was now back in the abusive father's custody does not give rise to a 14th Amendment claim because the father is not a state actor, even though he had at one time been in state custody. The same would hold for the safety plan, even if that could somehow be construed as state custody. And again, it cannot. It was a voluntary claim. Then still, nothing occurred during the period of the safety plan. By court order, he was back in the custody of his mother as of December 2nd, and the incidents here occurred in January. The second exception, and again it's a very narrow one that I think plaintiffs are trying to argue here, is this notion of a state-created danger. And this is the heading they put on Count 16 in the First Amendment complaint. But that too is false. DeShaney again makes clear that having once had the child in custody and returning the child to a parent in that case, a known abusive parent in the DeShaney case itself, again, that is not state-created danger. As again on page 201 of the court's decision, as it makes clear in DeShaney, they took the child from the abusive father and put him back with the abusive father, as bad as that ended up being. He was where he had been, even had there been, or he would have been, had there been no state intervention in the first place. If anything, the state had helped in the interim during which it had custody. So you cannot make out a state-created danger claim. Arguably, you cannot make one out ever having the child being returned to a natural parent. And indeed, the Morgan decision on which plaintiffs also relied, page 852, suggests as much, that giving it to a natural parent is not a state-created danger under any circumstances, but clearly it's not a state-created danger merely because the state had had temporary custody. DeShaney makes that crystal clear. And finally, just in conclusion, there is references made both in the complaint and then again in the briefs about the exercise of professional judgment and the failure to exercise professional judgment. And let me just be clear. The professional judgment standard, which the U.S. Supreme Court talked about in Niumberg, that's a standard that applies once the court concludes that there is a constitutional duty in the first place. In Niumberg, the individual there was in a state institution. Not surprisingly, they found custody. At that point, the question was, well, how do you balance these constitutional rights and decide what level of care, restraint, and so forth is required in the state-run institution? And the answer was you have to have the exercise of professional, some sort of professional judgment. Bonafide. Bonafide professional judgment, exactly right. But again, that doesn't come into play at all. That's the second question one asks. After you determine that there's a state duty, generally, as in Niumberg, because the person is in state custody. And again, nothing happened in this case during the one window of state custody. Nothing happened even during the alleged alternative window of state custody, which, in fact, was a voluntary safety plan. On either of these grounds, the court should affirm the judgment dismissing Director McKeown. If the court has no further questions, I'll remit any remaining time to the weapon. Thank you, counsel. May it please the court. Counsel. My name is Jeff Kane, and along with Richard Carey, we represent the athletes in this case, Dennis and Kimberly Endicott. I think it's become evident from argument in the documents that you've read that the attorney for the plaintiff is trying to get around the law in the state of Illinois, longstanding, well-established, that a person does not have a duty to protect another person from the criminal acts of a third party. They do not have liability for criminal acts committed upon another, upon a third party. And there are two sections specifically that he is attempting to proceed under, one of which is 314A of the restatement, and he's centered on 314A4, which deals with a voluntary custodian-protectee relationship. He's making the argument that that exists. The other section that he is focused on is 324 of the restatement, and 324 is very specific in its terms, in that it applies only under a circumstance where someone takes charge of another person. They have to take charge. If they haven't taken charge, 324 does not apply. And in this case, the plaintiff's attempt and the plaintiff's argument has a fatal problem that cannot be overcome, and that is the fact that Joseph Schoolfield is in the sole and exclusive custody of his mother. His mother is the only one who can make decisions about where Joseph is going to stay, where he's going to be, that type of thing. She has exclusive custody, and she is the sole person who has charge of Joseph, and that is evident throughout the pleadings in this case and throughout the briefs. I've made a short list of them here. Page 8 of the brief admits that as of December 2, 2008, the Madison County Court entered an order placing Joseph in the custody of his mother, Valerie Schoolfield. It's been admitted here today that that custody order was in effect on January 21, 2009. On page 11 of the brief, the plaintiff stated that Joseph Schoolfield was killed while he was in the custody of his mother, Valerie Schoolfield. On page 33 of the first amendment complaint, which is C191 of the record, it is alleged that Joseph Schoolfield was killed while he was in the custody of Valerie Schoolfield. Again, it's clear Joseph was in the sole and exclusive custody of his mother. She was the only one who could determine where he stayed and when. At any point in time, she was free to leave the Endicott residence. She was free to send Joseph to stay somewhere else other than the Endicott residence. There was nothing Dennis or Kimberly Endicott could have done to interfere with that. The plaintiff's attorney has failed to present to this court or to the circuit court any case which holds that under this type of circumstance, there is any duty under 314 or 324. Instead, we have presented to the court, as a part of our brief, the only case which apparently, which my research uncovered that would be on point, and that is the Sunderburg case. Sunderburg v. Howard is a case out of Minnesota. In that case, there were two minors who resided during the week with an uncle at the uncle's residence. The uncle's mother also lived at that same residence. According to the decision, the reason that those minors were staying with the uncle at the uncle's residence was that their mother was not getting them to school during the week as she should have been doing. During that same time frame, when the minors were staying with the uncle at the uncle's residence, the father of those two minors was also residing at the residence of the uncle. During that time period, allegedly, one of the minors was molested. They tried to make this same type of claim against the uncle in that case. That attempt was denied. The reason that it was denied is because, in the circumstance where the father was residing in the same residence with the children, the father was the one that had custody. The father was the one who had sole and exclusive custody. The father was the one who had charge of the minors. It could not be overcome by the uncle, just because the father and the children were living there. In order for there to be a custody or a taking charge, there has to be a conscious and intentional giving up of that custody and charge by the father. There has to be an intentional and outright acceptance of that responsibility. There's been none of that in this case. By the case law that's in place in the plaintiff's own pleadings, the plaintiff has not made a case and cannot make a case against Dennis or Kimberly Endicott. The cases the plaintiff has cited in the brief are not on point. The cases that have been raised today are not on point. I wanted to touch on one other thing in response to the question that was brought up today. The case was dismissed with prejudice by Judge Matogian, as it should have been, according to the law and the information that he had. There was no request for further relief to amend and proceed further with the case. The case was dismissed with prejudice. It was correctly dismissed with prejudice, and Judge Matogian should be affirmed in this case. Thank you, counsel. Thank you. Counsel? I would like to make two quick points on Ramon. The first, with respect to the claims against Dennis and Kimberly Endicott. There's been a lot of argument saying that you must have taken charge of this person, you must have taken charge of this person. Kim and Dennis Endicott have the right to say who does and does not live in their homes. That's something that cannot be disputed. They exclusively have that right. And again, this is a three-year-old child. If you're going to then just say, well, we'll let you stay here, but, you know, if something bad happens to you, well, whatever. That does not seem to be the law. Especially in light of Platson, which is the Lone, Illinois case, really deciding on this issue. Certainly, there has to be, if we're going to find that a work-study relationship with an employer is going to be sufficient grounds to say that there's a custodian-protective relationship, it must logically follow that if you have someone who's residing in your home, someone that you had temporarily taken charge of, a DCFS safety plan, that you had to assume some type of charge over the plaintiff's welfare. Secondly, with respect to what state action is considered relevant to determine whether someone's substantive due process rights have been violated, the plaintiff would submit to you that physical custody or control is not the only relevant action. The Supreme Court in the past has looked at cases where we have seen what action has been taken with respect to an individual, and then subsequently looked at whatever the constitutional consequences would be of their subsequent inaction. I direct the court to Youngberg v. Romeo on this case. There's even a Seventh Circuit case where this was expressly evident, called White v. Rochford. In that case, police officers had pulled over a driver for drag racing. There were three minor children that were in the car. After they had arrested the driver and taken him to the police station, police officers just left the children there. Couldn't that fall under the exception where the state creates the danger? At the time White v. Rochford was decided, Your Honor, there was no such state-created danger exception at that time, which is why I think it's instructive that what the court did in that case is looked at what did the state do first with respect to you, and then subsequently look at, okay, now what is the constitutional consequences of your subsequent inaction? And here, if we look at what was done with respect to Joseph Schoelfeld, you absolutely must find that there has been a substantive violation of his due process rights. Here we have a child who's been under investigation by the Department of Children and Family Services. He was twice removed from his mother's custody because he was being beaten, twice put back in that situation. He then subsequently has knowledge on the part of caseworkers who know he's continually being beaten after he's been given back the last time, and that he's ultimately murdered. Now, it does not, to me, the Constitution cannot be indifferent to this type of indifference that was shown by these state actors. It's inconceivable to say that, well, we're going to have knowledge of the really bad situation that you're into, and even though it's our duty, it's our charge under the public policy of the state of Illinois to actually protect you in these situations, we're just going to lay it back so that none of us get in trouble. The Constitution cannot be said to be indifferent to that type of indifference. Thank you. Thank you, Counsel. We appreciate the briefs and arguments of all counsel on this matter under advisement. Thank you.